1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

                              Plaintiff,

v.

BRUCE MOTEN,

                              Defendant.

Case No.:  22-cr-2135-JO-1


**ORDER DENYING DEFENDANT MOTEN'S MOTION TO SUPPRESS**

     The United States has charged Defendant Bruce Moten with transporting undocumented people in violation of 8 U.S.C. § 1324.  On August 18, 2022, Border Patrol arrested Defendant after discovering several of these individuals hidden in his vehicle.  Defendant seeks to suppress the discovery of these passengers on the grounds that the government obtained this evidence through a series of unlawful seizures, first by stopping him without reasonable suspicion and subsequently, by arresting him without probable cause.  *See* Dkt. 67 ("Mot. Suppress").  For the reasons set forth below, the Court denies Defendant's motion to suppress.

/ / /

# I. FINDINGS OF FACT

On May 10, 2023, and July 28, 2023, the Court held two evidentiary hearings to hear testimony on the alleged unlawful seizures that led to the discovery of undocumented passengers in Defendant's car. *See* Dkt. 74 ("Tr. Hr'g 1"); Dkt. 82 ("Tr. Hr'g 2"). During these proceedings, the Court heard testimony from Border Patrol Agents Matthew Lewis, Francisco Gonzales, Jason Larson, and Kristoffer Huggins, and found them credible. *See id.* Based on their testimony, as well as the parties' declarations and exhibits, the Court makes the following findings of fact. *See United States v. Whitten*, 706 F.2d 1000, 1019 (9th Cir. 1983) ("The trial judge is not bound by the hearsay rule in making preliminary determinations such as whether evidence is admissible at trial.").

## A. Border Patrol's First Encounter with Defendant

Border Patrol first became aware of Defendant's presence in the border region of Tecate, California on the evening of August 18, 2022. Tr. Hr'g 1 at 6:12–9:5. Around 6:30 PM, Border Patrol Agent Matthew Lewis heard a scope operator, an agent that surveils the region for suspicious activity, broadcast that a blue Jaguar was circling the Ameri Mex Gas Station ("Ameri Mex") on Highway 188. *Id.* at 7:21–9:5; Dkt. 67-1 ("Lewis Mem.") at 2. Shortly thereafter, Agent Lewis observed a blue Jaguar, occupied by an African American male driver and female passenger, parked at a bus stop in front of the Ameri Mex. Tr. Hr'g 1 at 9:13–24; Lewis Mem. at 2. Because Agent Lewis knew that the Ameri Mex is commonly frequented by human smugglers, he communicated his observations to Border Patrol Agent Francisco Gonzales around 6:40 PM. *Id.* at 9:13–18; Dkt. 68-1 ("Decl. Lewis") ¶¶ 5–6.

After Agent Lewis alerted Agent Gonzales to the Jaguar's activities, Agent Gonzales decided to surveil the vehicle. Tr. Hr'g 1 at 23:6–24:16. He located the vehicle parked in front of a storage lot off of Highway 188, just north of the Ameri Mex. *Id.* at 24:14–22. As he drove by, he also observed an African American male driver and female passenger in the car and noted that the driver was on his phone. *Id.* at 40:21–25; Dkt. 68-2 ("Decl. Gonzales") ¶ 6. Agent Gonzales proceeded to radio the San Diego Sector

Communications, a communication center that dispatches emergency support services to agents in the region, for the vehicle's records and learned that the Jaguar had no history of traveling in the area and was registered in Pacoima, California, a city approximately 180 miles from Tecate near Los Angeles.  Tr. Hr'g 1 at 24:23–25:18; Decl. Gonzales ¶¶ 7–9. Continuing to observe the vehicle, Agent Gonzales followed the Jaguar as it parked in front of the Ameri Mex.  Tr. Hr'g 1 at 26:7–11; Decl. Gonzales ¶¶ 6, 11.

Meanwhile, after hearing Agent Gonzales's inquiry about the Jaguar over the service radio, Border Patrol Agent Jason Larson also drove to the Ameri Mex to inspect the situation.  Tr. Hr'g 1 at 57:12–22.  After Agents Gonzales and Larson conferred, they decided to speak to the driver of the blue Jaguar, reasoning that the driver's conduct was suspect since he was lingering in this area so far from home.  *Id.* at 27:18–28:19, 35:5–9, 42:14–17, 55:22–56:3, 58:23–59:11, 63:22–64:3.

Around 6:50 PM, Agents Gonzales and Larson approached the blue Jaguar.  *Id.* at 58:21; Dkt. 68-3 ("Decl. Larson") ¶ 11.  At the time, Agent Larson was wearing plain clothes with an agency badge and carrying a firearm while Agent Gonzales was sporting his rough duty uniform with a gun holstered in his belt.  Tr. Hr'g 1 at 22:20–23:2, 42:22–43:12, 56:10–12, 57:1–11, 65:13–66:1; Dkt. 67-2 ("Larson Mem.") at 2; Dkt. 67-3 ("Gonzales Mem.") at 2.  When the agents walked up to the vehicle, they realized that the driver was inside the gas station convenience store.  Tr. Hr'g 1 at 28:21–23, 43:13–17, 60:4–16, 66:5–16; Decl. Gonzales ¶ 11; Decl. Larson ¶ 11.  Accordingly, they waited for him to exit, standing around six to eight feet in front of the driver's side of the car.  Tr. Hr'g 1 at 28:24–29:19, 43:19–23, 44:13–22.  When Defendant came outside, Agents Gonzales and Larson politely introduced themselves and inquired what Defendant was doing in the area.[1]  *Id.* at 29:22–30:5, 33:16–24, 46:5–12, 60:10–20, 62:15–63:4; Decl.

---

[1] Agents Gonzales and Larson testified that they approached Defendant in a polite and casual manner.  Tr. Hr'g 1 at 33:16–24, 62:15–63:4.  Defendant did not testify but insists in his declaration that the agents immediately asked, "What are you doing here? You look suspicious," to which he responded, "What does suspicious look like?"  Dkt. 67-5 ("Def.'s Decl.") ¶¶ 7–9.  He also asserts that the agents

Larson ¶ 12.  Defendant responded that he had gotten lost while travelling between San Ysidro and El Cajon because his vehicle's navigation system was not working.  Tr. Hr'g 1 at 30:7–18, 60:10–20.  He explained that he remained in the area because he had lost cell service and was waiting for a phone call.  *Id.* at 30:11–18, 31:12–17, 60:17–20.  The agents questioned the veracity of Defendant's response because (1) Tecate was twenty miles west of San Ysidro and not on the route between El Cajon and San Ysidro and (2) Defendant stated he was waiting for a phone call even though he claimed to not have reception.  *Id.* at 30:11–22, 31:12–19, 61:6–12.  Agent Larson told Defendant that he did not believe him and warned Defendant that he was being watched if he was there to smuggle people across the border.  *Id.* at 31:22–32:5, 61:13–17.  In response, Defendant became hostile and told the agents to "go eat a dick."  *Id.* at 33:12–15, 34:1–2, 61:18–20.  Defendant then ended the conversation by walking back inside the gas station convenience store, prompting the agents to leave.  *Id.* at 34:3–23, 61:20–24, 71:3–6.  Agent Larson estimates that the conversation took no more than five minutes while Agent Gonzales believes the conversation lasted ten to fifteen minutes.  *Id.* at 34:5–6, 63:5–8.  Both agents assert that they maintained a polite and respectful demeanor throughout the entire conversation and never gestured toward or otherwise drew attention to their service weapons.  *Id.* at 32:12–13, 33:16–24, 62:5–63:4.

**B. Border Patrol's Second Encounter with Defendant**

After this interaction with Defendant, Agent Gonzales continued to observe Defendant's vehicle until the car departed the Ameri Mex, heading east on Thing Road towards El Cajon.  *Id.* at 35:10–36:8; Gonzales Mem. at 2.  Approximately thirty minutes later, around 7:30 PM, Agent Gonzales spotted Defendant's vehicle again, this time parked by an abandoned bus in a dirt pullout off Humphries Road.  Tr. Hr'g 1 at 36:5–37:20; Decl.

---

mocked him and stated that he looked like a rapper.  *Id.* ¶ 13.  The Court found the agents' testimony that Defendant's race played no role in their reasons for stopping him, that they spoke to Defendant politely, and that they limited their conversation to his reasons for being in the region to be credible.  Tr. Hr'g 1 at 49:25–50:5, 63:16–20.

Gonzales ¶ 17.  Agent Gonzales was aware that smugglers commonly use this dirt pullout because the spot is close to an area where undocumented entrants frequently jump the border fence between Mexico and the United States.  Decl. Gonzales ¶ 18.  Agent Gonzales proceeded to drive past the pullout and later shared his suspicions with Border Patrol Agent Kristoffer Huggins.  Tr. Hr'g 1 at 37:20–38:2, 50:13–24, 79:10–17; Decl. Gonzales ¶ 19. In doing so, Agent Gonzales informed him about Defendant's activities near the Ameri Mex and their previous interaction.  Tr. Hr'g 1 at 50:13–51:15, 79:15–80:1; Decl. Gonzales ¶ 19; Dkt. 68-34 ("Decl. Huggins") ¶ 5.  He also informed Agent Huggins that he had last seen Defendant at the dirt pullout off Humphries Road.  Tr. Hr'g 1 at 51:8–10, 80:2–6.

Based on the information provided by Agent Gonzales, Agent Huggins drove to find the blue Jaguar.  *Id.* at 80:7–81:1.  Around 8:15 PM, while driving down Humphries Road, Agent Huggins came across Defendant's vehicle parked in the same dirt pullout Agent Gonzales had described.  *Id.* at 83:1–3; Tr. Hr'g 2 at 4:21–5:2; Decl. Huggins ¶ 6. He then drove further down the road, where he continued to observe the vehicle.  Tr. Hr'g 1 at 80:7–81:1.  Around 8:30 PM, Agent Huggins heard a scope operator broadcast that a motion sensor device for illegal crossings had been activated and that three to four individuals were spotted crossing the border on foot heading north near where Defendant's vehicle was parked.  *Id.* at 84:21–24, 85:2–11.

From his vantage point, Agent Huggins noticed Defendant's car leave the dirt pullout around 8:52 PM, about thirty minutes after the broadcast about the illegal border crossing.  *Id.* at 87:25–88:14; Decl. Huggins ¶ 9.  Although he did not observe anyone enter the car, Agent Huggins decided to follow the vehicle, reasoning that it was more than feasible for individuals to travel from the border fence to Defendant's car in that time. Decl. Huggins ¶ 9.  While following the Jaguar, Agent Huggins requested a record check on the Jaguar's license plates.  Tr. Hr'g 1 at 88:15–16; Tr. Hr'g 2 at 6:1–2.  In response, he learned that the car was registered to either Thomas Holmes or Bruce Moten in Pacoima, California, and that the vehicle had no prior border crossings.  Tr. Hr'g 1 at 90:11–91:1; Tr. Hr'g 2 at 6:1–6.  This information heightened Agent Huggins's suspicion: he knew

Crim case: 22-cr-2135-JO-1

from experience that smugglers are often recruited from the Los Angeles County area and found it unreasonable that someone would travel three hours from Pacoima to Tecate without crossing the border.  Tr. Hr'g 1 at 91:21–24; Decl. Huggins ¶ 11.  Agent Huggins continued to follow the blue Jaguar as it abruptly turned left onto Potrero Valley Road.  Tr. Hr'g 1 at 92:8–18; Tr. Hr'g 2 at 6:7–13.

 Based on his observations and earlier conversation with Agent Gonzales, Agent Huggins decided to pull Defendant over for questioning.  Tr. Hr'g 1 at 91:14–92:11; Tr. Hr'g 2 at 4:21–6:19; Decl. Huggins ¶ 13.  When Agent Huggins initiated his sirens and lights, Defendant did not pull over, but accelerated, increasing the car's speed to around 45 miles per hour.  Tr. Hr'g 1 at 95:23–96:5; Tr. Hr'g 2 at 9:9–10:19; Decl. Huggins ¶ 14. Despite passing multiple turnouts, Defendant continued driving while Agent Huggins followed with his lights and sirens engaged.  Tr. Hr'g 1 at 95:19–97:1; Tr. Hr'g 2 at 9:9–10:24; Decl. Huggins ¶ 15.  After Agent Huggins switched his siren from a chirp to a wail, Defendant pulled into the parking lot of Café 94.  Tr. Hr'g 2 at 10:24–11:19; Decl. Huggins ¶ 15.

 Agent Huggins then parked directly behind the blue Jaguar and started to exit his car to conduct the stop.  Tr. Hr'g 2 at 12:9–15.  However, Defendant did not stop, but continued driving and began turning his wheels left, indicating to Agent Huggins that he was attempting to make a U-turn around Agent Huggins's vehicle.  Tr. Hr'g 1 at 97:8–11; Tr. Hr'g 2 at 12:15–18.  In response, Agent Huggins yelled that he was Border Patrol and instructed the driver to stop the vehicle and turn off the engine.  Tr. Hr'g 1 at 97:12–14; Tr. Hr'g 2 at 12:19–23.  Instead of stopping, Defendant continued to turn his car, this time pointing the Jaguar towards Agent Huggins's vehicle.  Tr. Hr'g 2 at 12:24–13:1.  Fearing that the Defendant would attempt to flee or even hit him with his car, Agent Huggins pulled out his firearm from his holster and pointed it in Defendant's direction, shouting at him to stop the vehicle, raise his hands, and roll down the windows.  Tr. Hr'g 1 at 97:20–23; Tr. Hr'g 2 at 12:24–13:5, 14:6–15:9.  Agent Huggins also requested backup, notifying dispatch that this was a high risk stop, and that he was holding a vehicle at gunpoint.  Tr. Hr'g 1 at

97:20–23; Tr. Hr'g 2 at 13:4–5; Decl. Huggins ¶ 16.  In response to Agent Huggins's commands, Defendant rolled down his window and yelled, "You have no right to pull me over, I'm out of here." Tr. Hr'g 2 at 13:21–14:5; Decl. Huggins ¶ 17; Dkt. 67-4 ("Huggins Mem.") at 5.  Agent Huggins repeated his commands that Defendant stop the vehicle and notified backup that Defendant was attempting to maneuver out of the parking lot and flee. Tr. Hr'g 2 at 13:4–5; Huggins Mem. at 5.

Defendant eventually stopped the Jaguar and turned off the engine.  Tr. Hr'g 1 at 99:10–13; Tr. Hr'g 2 at 17:16–19; Decl. Huggins ¶ 17.  Agent Huggins then instructed Defendant and the passenger to keep their hands in sight, stay in the vehicle, and roll down all the windows.  Tr. Hr'g 2 at 17:25–18:2; Decl. Huggins ¶ 17.  Defendant responded defiantly, claiming that Agent Huggins had no authority over him. Tr. Hr'g 2 at 18:3–9; Decl. Huggins ¶ 18.  Agent Huggins informed Defendant that he was being detained and that when back up arrived, he would explain everything.  Tr. Hr'g 1 at 99:17–19; Tr. Hr'g 2 at 18:10–13.

Around 9:07 PM, Border Patrol Agent John Wemhoener arrived at the Café 94 parking lot to provide back up for Agent Huggins.  Tr. Hr'g 1 at 99:20–22; Tr. Hr'g 2 at 18:12–18.  Agent Wemhoener then handcuffed Defendant and placed him into the back of Agent Huggins's border patrol vehicle. Tr. Hr'g 1 at 100:4–7; Tr. Hr'g 2 at 19:8–19.  When Agent Huggins approached the Jaguar, he saw four individuals hiding in the vehicle.  Tr. Hr'g 2 at 19:24–20:2.  After conducting an immigration inspection, he learned that they had illegally entered the United States from Mexico without proper documentation.  Tr. Hr'g 1 at 100:13–20; Tr. Hr'g 2 at 20:8–15.

## II. DISCUSSION

Defendant moves to suppress the government's discovery of undocumented passengers hiding in his vehicle on the grounds that the government obtained this information by conducting two illegal seizures.  Mot. Suppress.  In deciding this motion, the Court must first consider whether Defendant's conversation with Agents Gonzales and Larsen at the Ameri Mex gas station constituted a seizure, not a consensual conversation.

1    If the former, the Court must also determine whether the agents had reasonable suspicion

2    to detain Defendant at that time.  Second, the Court must assess whether Agents Huggins

3    and Wemhoener conducted an investigatory stop in the parking lot of Café 94 or whether

4    this encounter became an arrest when the agents drew a gun, handcuffed Defendant, and

5    placed him in the patrol car.  Finally, the Court must examine whether Agents Huggins and

6    Wemhoener had the requisite basis—reasonable suspicion if a stop or probable cause if an

7    arrest—to justify their actions regarding Defendant.  The Court will consider each of these

8    issues in turn.

9    **A. Border Patrol's Initial Conversation with Defendant Was Not a Seizure**

10    Defendant argues that Agents Gonzales and Larson unlawfully seized him when they

11    approached and questioned him at the Ameri Mex without reasonable suspicion.  Mot.

12    Suppress at 7–10.  In examining this argument, the Court must first determine whether

13    these agents engaged Defendant in a consensual conversation or in fact, through their

14    words and actions, conducted a seizure.

15    Under the Fourth Amendment, an encounter with law enforcement is generally

16    considered a consensual interaction unless the officers' behavior causes the subject to feel

17    restrained.  *Florida v. Bostick*, 501 U.S. 429, 434 (1991).  In such circumstances, where "a

18    law enforcement officer, through coercion, physical force, or a show of authority" "restricts

19    the liberty of a person," the interaction becomes a seizure and must be supported by

20    reasonable suspicion.  *United States v. Washington*, 490 F.3d 765, 771 (9th Cir. 2007)

21    (internal citation and quotation marks omitted).  However, "a seizure does not occur simply

22    because a police officer approaches an individual and asks a few questions."  *Florida*, 501

23    U.S. at 434.

24    In determining whether an interaction is a consensual conversation or a seizure, a

25    court must examine whether "a reasonable person in that position" would feel free to leave

26    the situation.  *United States v. Redlightning*, 624 F.3d 1090, 1102 (9th Cir. 2010) (internal

27    citation and quotation marks omitted).  Looking to the totality of the circumstances, courts

28    evaluate whether an innocent person, in the defendant's position, would feel that he had no

choice but to comply with the officers' demands. *Id.* at 1102–03. In making this determination, courts consider "(1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's tone or manner was authoritative, so as to imply that compliance would be compelled; and (5) whether the officers informed the person of his right to terminate the encounter." *Washington*, 490 F.3d. at 771–72 (internal citation omitted). Importantly, "a seizure does not occur if, in response to a show of authority, the subject does not yield; in that event, the seizure occurs only when the police physically subdue the subject." *United States v. Santamaria-Hernandez*, 968 F.2d 980, 983 (9th Cir. 1992) (citing *California v. Hodari D.*, 499 U.S. 621, 624–25 (1991)).

First, the Court finds that the circumstances in which the agents encountered Defendant were non-threatening because the conversation took place in a public space where Defendant was not outnumbered. To begin, the agents approached Defendant in a parking lot outside a gas station convenience store that was open for business. *See* Tr. Hr'g 1 at 28:21–23, 43:13–17, 66:5–16. Because the interaction occurred before nightfall in an open space, likely frequented by other customers and within eyesight of store attendants, the officers' actions were visible to others. *See id.* at 11:23–13:6; Decl. Gonzales ¶¶ 6, 11; Decl. Larson ¶¶ 11, 12. Accordingly, a reasonable person would not find this context intimidating, knowing that the agents could not use aggressive or confrontational tactics without facing public scrutiny. *See United States v. Brown*, 996 F.3d 998, 1005 (9th Cir. 2021) (noting the fact that interaction occurred in a highly visible public space weighed in favor of finding it consensual); *cf. United States v. Alvarado*, 763 F. App'x 609, 611 (9th Cir. 2019) (concluding encounter was a stop in part because it took place late at night in an isolated residential setting where a reasonable person would feel more afraid). Furthermore, when the agents approached Defendant, his companion was sitting nearby in the passenger seat of his car. *See* Tr. Hr'g 1 at 28:24–29:25, 40:19–20. Because Defendant was not meaningfully outnumbered by Agents Gonzales and Larson, the Court finds that the presence of the two officers did not create an intimidating or threatening atmosphere.

9

1    Second, the Court finds that the agents' brief and peaceful conversation with
2    Defendant was neither combative nor coercive.  Critically, the agents did not exert their
3    law enforcement authority to pressure Defendant into a conversation.  Upon arriving at the
4    Ameri Mex, Agents Gonzales and Larson realized that Defendant was inside the
5    convenience store.  *See* Tr. Hr'g 1 at 28:21–23, 43:13–17, 60:4–13, 66:5–16.  Instead of
6    immediately entering the Ameri Mex and accosting Defendant, the agents waited for him
7    to exit.  *See id.* at 29:17–23, 43:19–25, 66:8–16.  By not cornering or interrupting
8    Defendant, but rather waiting for him to enter an open space, the agents did not exert
9    control over Defendant's movements or activities.  *See Brown*, 996 F.3d at 1006 (weighing
10   the fact that the police permitted the defendant to continue a phone call without interruption
11   in concluding that the encounter was consensual).  Thus, the agents met Defendant on his
12   terms, signaling that the encounter was voluntary and that his compliance was in no way
13   mandatory.  Moreover, the agents' demeanor further reinforced the message that the
14   conversation was not compulsory.  The agents credibly testified that they politely
15   introduced themselves and kept a respectful demeanor while asking Defendant why he was
16   in the area, communicating the casual nature of their inquiry.  Tr. Hr'g 1 at 33:16–24,
17   62:15–63:4; *see Brown*, 996 F.3d at 1005 (commenting that officers' conduct was "casual"
18   and "nonthreatening").  While both agents were armed and Agent Gonzalez was dressed
19   as law enforcement, neither gestured to their weapons nor signaled intent to use force.  Tr.
20   Hr'g 1 at 32:12–13, 65:13–17; *see Washington*, 490 F.3d at 770.  Although the agents
21   expressed suspicion and provided Defendant with a friendly warning, this alone did not
22   convert the conversation into a seizure.  Tr. Hr'g 1 at 31:22–32:5, 61:13–17; *see Brown*,
23   996 F.3d at 1005.  Even though the agents did not explicitly state that Defendant could
24   ignore their questions, their calm demeanor and casual questioning implied that he was free
25   to do so.  Tr. Hr'g 1 at 32:6–33:24, 62:2–63:4; *see Brown*, 996 F.3d at 1005.  Accordingly,
26   the Court finds that the interaction would have "communicated to a reasonable person that
27   he was [free] to ignore [their] presence and go about his business," supporting the
28

conclusion that the interaction was not a seizure. *Florida*, 501 U.S. at 437 (internal citation and quotation marks omitted).

The above circumstances would not only demonstrate to a reasonable person that he was free to leave, but also *did* in fact empower Defendant to end the interaction. When the agents warned Defendant to not engage in human smuggling and informed Defendant that he was being watched, he responded aggressively and refuted their authority. Tr. Hr'g 1 at 33:12–15; *Santamaria-Hernandez*, 968 F.2d at 983. Defendant felt comfortable enough to defy the officers by telling them to "eat a dick,"[2] showing that he did not respect, let alone fear, their authority. Tr. Hr'g 1 at 34:1–2, 61:18–20. Ultimately, Defendant decided to end the conversation with the officers by walking away from them and reentering to the gas station, which the agents permitted him to do. *Id.* at 34:3–23, 61:20–24, 71:3–6. Accordingly, Defendant's actions reveal that he felt unintimidated by the officers and free to leave what he considered a consensual interaction.

Defendant's insistence that the agents blocked his pathway and, thus, restricted his movement does not convince the Court otherwise. Mot. Suppress at 9. Defendant alleges that because Agents Gonzales and Larson stood several feet in front of his car, they restricted his liberty to enter his vehicle and leave thereby effecting a seizure. Tr. Hr'g 1 at 28:21–29:19, 60:4–9. While the Ninth Circuit in *Washington* heavily weighed the fact that an officer "positioned himself between [the defendant] and his car," limiting his options to leave, the court's decision relied on a number of other factors not present here, including the fact (1) that the interaction occurred late at night, (2) that the officers had searched the defendant's person in an "authoritative manner," and (3) that the officers had purposefully directed the defendant away from his vehicle. 490 F.3d at 772–73. Here, while the agents may have blocked Defendant's pathway, the conversation and the context in which it occurred would have communicated to a reasonable person that Defendant was

---

[2] The Court notes that Defendant's defiant response belies Defendant's argument that he felt compelled to comply with the officers on account of his race. Def.'s Decl. ¶¶ 8–9.

free to go because the agents (1) approached Defendant where their actions were visible to the public and when he was near his companion; (2) deferred to Defendant's convenience in initiating the conversation and respectfully engaged with him; and (3) permitted Defendant to terminate the conversation and return to his business. Therefore, the officers' physical positioning relative to Defendant's car did not render this otherwise consensual interaction a seizure. *United States v. Kim*, 25 F.3d 1426, 1431 (9th Cir. 1994) (holding that partially blocking a defendant's "egress" alone does not effect a seizure).

In sum, Agents Gonzales and Larson's conversation with Defendant was consensual: the fact that police engaged him politely without coercion in a nonthreatening context would have communicated to reasonable person that Defendant was free to leave. Moreover, this interaction ultimately culminated in Defendant acting on this impression by insulting the agents and walking away. Under the totality of the circumstances, the Court concludes that this encounter was not a seizure. Because the Court finds that this conversation was consensual, it is "outside the ambit of the Fourth Amendment's guarantee against unreasonable searches and seizures," and the Court need not examine whether the officers had reasonable suspicion. *Kim*, 25 F.3d at 1430.

**B. Agent Huggins Conducted a *Terry* Stop, Not an Arrest Near Café 94**

Defendant contends that Agents Huggins and Wemhoener's encounter with him in the parking lot of Café 94 evolved into an arrest when the agents pointed a firearm at him, handcuffed him, and placed him in the patrol car. Dkt. 76 ("Suppl. Br.") at 8–14. The Court must first decide whether this interaction constituted an investigatory stop or an arrest before determining whether these actions were justified under the Fourth Amendment.

The Fourth Amendment provides protection against two types of seizures: investigatory stops and arrests. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). An investigatory stop, commonly referred to as a "*Terry* stop," consists of, at most, "a brief stop, interrogation, and under proper circumstances, a brief check for weapons." *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001) (internal citation and quotation marks

omitted).  *Terry* stops empower law enforcement to stop suspects for "investigative detentions" on the condition that "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983).  An arrest, on the other hand, goes beyond an "investigative detention," and involves the "taking or detainment of a person in custody by authority of law." *United States v. Leal-Felix*, 665 F.3d 1037, 1041 (9th Cir. 2011) (internal citations and quotation marks omitted).  Because an arrest bears the more intrusive hallmarks of either "informing the suspect that he is under arrest, transporting the suspect to the police station, and/or booking the suspect into jail," *id.*, an arrest can only occur after a judicial warrant is issued or a finding of probable cause, *United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010).  *See also Graham v. Connor*, 490 U.S. 386, 397 (1989) (permitting officers to use "objectively reasonable" force in conducting an arrest).

A seizure that initially begins as a stop may evolve into an arrest when law enforcement employs intrusive methods that are not clearly justified by the dangers of the situation.  *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996).  Because a *Terry* stop requires that police use the "least intrusive means" necessary to evaluate the suspicion at hand, courts have recognized that such a stop can become an arrest when it becomes more invasive than required.  *Royer*, 460 U.S. at 500.  To begin, courts assess "the intrusiveness of the stop" by considering "the aggressiveness of the police methods and how much the plaintiff's liberty was restricted."  *Lambert*, 98 F.3d at 1185.  However, a stop does not become an arrest merely because intrusive force was used if the threats at hand justified the methods used.  *United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990).  Ultimately, this inquiry boils down to a question of whether an officer's conduct was a "reasonable response to legitimate safety concerns on the part of the investigating officers."  *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009) (internal citation and quotation marks omitted).  If law enforcement's intrusive techniques were called for under the circumstances, the seizure remains a *Terry* stop even if officers resorted

1    to "holding a suspect at gunpoint" or "handcuff[ing] a suspect." *Del Vizo*, 918 F.2d at 824;

2    *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) ("[A] policeman making a

3    reasonable investigatory stop should not be denied the opportunity to protect himself from

4    attack by a hostile suspect."). This especially holds true where a "suspect is uncooperative

5    or takes action at the scene that raises a reasonable possibility of danger or flight during a

6    *Terry* stop." *Lambert*, 98 F.3d at 1189.

7         Here, Agents Huggins and Wemhoener's stop of Defendant did not amount to an

8    arrest because their aggressive tactics—raising a firearm, employing handcuffs, and

9    positioning Defendant in the back of their vehicle—were needed to investigate the situation

10   without putting themselves in jeopardy. *See* Tr. Hr'g 1 at 97:20–23, 100:4–7. First, the

11   agents had fair reason to believe that they needed to use forceful measures because

12   Defendant hostilely resisted their commands to stop his vehicle. *See Lambert*, 98 F.3d at

13   1189. Principally, when Agent Huggins parked his car and exited his vehicle to initiate a

14   *Terry* stop, Defendant continued driving forward and initiated a U-turn as if attempting to

15   flee. Tr. Hr'g 1 at 97:8–23; Tr. Hr'g 2 at 12:15–13:4. Even after Agent Huggins raised

16   his weapon, Defendant expressed his intent to leave and refuted the agent's authority,

17   yelling that he did not have right to stop him. Tr. Hr'g 2 at 13:21–14:5; Decl. Huggins ¶

18   17; Huggins Mem. at 5. Accordingly, Agent Huggins's use of a firearm and Agent

19   Wemhoener's use of handcuffs and decision to put Defendant in the back of the car were

20   justifiable in light of Defendant's defiance and attempt to escape. *See* Tr. Hr'g 1 at 97:20–

21   23, 100:4–7; *Guzman-Padilla*, 573 F.3d at 885–86 (acknowledging that force is justified

22   where there are indications that a target will not "yield"); *Haynie v. County of Los Angeles*,

23   339 F.3d 1071, 1077 (9th Cir. 2003) (finding that stop did not become an arrest because

24   use of handcuff and placement in the back of the car were necessary due to defendant's

25   uncompliant, belligerent behavior).

26        Second, the agents needed to employ aggressive techniques to conduct the *Terry*

27   stop without putting their lives at risk. *Lambert*, 98 F.3d at 1189. When Defendant canted

28   his wheels toward Agent Huggins, his vehicle was facing perpendicular to Agent Huggins,

creating a dangerous situation.   Tr. Hr'g 2 at 12:24–13:5, 14:6–15:9.   In light of Defendant's prior conduct, Agent Huggins reasonably concluded that Defendant may try to hit him, requiring Agent Huggins to assert more authority and use protective measures by drawing his firearm.  *Id.*; *cf. Del Vizo*, 918 F.2d at 825 (finding that stop was an arrest because the defendant did not pose a danger as he permitted himself to be frisked).  Due to Defendant's earlier threatening behavior, Agent Wemhoener's use of handcuffs and decision to place Defendant in the back of the vehicle were also well warranted.  Tr. Hr'g 1 at 100:4–7.  Moreover, Agent Wemhoener only restrained Defendant in this fashion for a matter of minutes before the agents discovered the undocumented noncitizens and commenced Defendant's arrest.  Tr. Hr'g 2 at 19:7–20:3; *see United States v. Bravo*, 295 F.3d 1002, 1011 (9th Cir. 2002) (finding that stop was not arrest where defendant was only handcuffed for a short period of time).

In conclusion, the agents' *Terry* stop did not amount to an arrest because the officers' aggressive tactics were necessary in light of the risks present to the officers and their investigation.

## C.  Agent Huggins's *Terry* Stop Was Supported by Reasonable Suspicion

Because the Court concludes that Agents Huggins and Wemhoener's investigatory stop did not become an arrest on account of their aggressive tactics, the Court must examine whether the stop was supported by the requisite justification—reasonable suspicion.

Under the Fourth Amendment, a *Terry* stop requires reasonable suspicion, even near the border.  *See Brignoni-Ponce*, 422 U.S. at 884–85.  To establish reasonable suspicion, the government has the burden of proof to show that the officer was "aware of specific, articulable facts which, when considered with objective and reasonable inferences, form[ed] a basis for *particularized* suspicion."  *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc).  In examining reasonable suspicion, courts "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted).  Reasonable

suspicion may be based on the collective knowledge of all officers involved in investigation, *United States v. Hoyos*, 892 F.2d 1387, 1392 (9th Cir. 1989), "even if some of the information known to others is not communicated to the detaining officer prior to a *Terry* stop," *United States v. Butler*, 74 F.3d 916, 921 (9th Cir.1996) ("[C]ollective knowledge of police officers involved in an investigation, even if some of the information known to other officers is not communicated to the arresting officer" can establish the requisite support.). *See also United States v. Fernandez*, 388 F.3d 1199, 1253 (9th Cir. 2004) ("[T]he conclusions of experienced law enforcement officers [are considered reliable in determining whether] evidence of a crime is likely to be found." (internal citation and quotation marks omitted)).

"Individual factors that may appear innocent in isolation may constitute suspicious behavior when aggregated together." *United States v. Diaz-Juarez*, 299 F.3d 1138, 1141 (9th Cir. 2002) (internal citation and quotation marks omitted). Near the border, certain factors are especially important in making this determination, including: (1) "the area in which the officers encounter a vehicle" and "[i]ts proximity to the border;" (2) "the usual patterns of traffic" on that road; (3) whether there was a "recent illegal border crossing;" (4) a "driver's behavior," such as "attempts to evade officers;" and (4) the nature of the driver's vehicle. *Brignoni-Ponce*, 422 U.S. at 884–85. While courts consider an officer's "experience" in analyzing reasonable suspicion, experience alone does not "give the officers unbridled discretion in making a stop." *Montero-Camargo*, 208 F.3d at 1131 (internal citation and quotation marks omitted). Instead, officers must rely on "facts," rather than their own "mere subjective impressions." *Diaz-Juarez*, 299 F.3d at 1141 (internal citation and quotation marks omitted). Importantly, "reasonable suspicion may not be based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002) (internal citation and quotation marks removed).

1   Here, Agent Huggins had reasonable suspicion to stop Defendant because Defendant

2   engaged in suspect behavior that mirrored common human smuggling patterns.   First,

3   Defendant had no credible reason to be in the Tecate region.   Border Patrol Agents

4   Gonzales and Huggins both stated that travelers rarely come to Tecate unless they plan to

5   cross the border as there are no other attractions drawing outsiders to the area.   Tr. Hr'g 1

6   at 55:20–56:3, 91:14–24; Decl. Huggins ¶ 11.   Thus, the fact that Defendant's car was

7   registered in Pacoima, California, an approximately three-hour 180-mile drive from Tecate,

8   and had no history of crossing the border justifiably raised red flags.   Tr. Hr'g 1 at 25:1–

9   18, 28:8–18, 35:5–9, 63:22–64:3, 91:21–24; *see Montero-Camargo*, 208 F.3d at 1139

10  (establishing that a suspect's license plate may shed light on their motives).   Defendant's

11  explanations for being in the area and loitering around the Ameri Mex were also

12  nonsensical.   Defendant's insistence that he did not have cell service was suspicious as

13  Agent Gonzales had seen Defendant on his phone only moments earlier.   Tr. Hr'g 1 at

14  30:11–18, 31:12–19; Decl. Gonzales ¶ 6.   Additionally, Defendant claimed that he was

15  waiting for a call contradicting his own statement that he lacked cell service.   *Id.*

16  Furthermore, Defendant's explanation that he got lost between San Ysidro and El Cajon

17  was not credible in light of the fact that Tecate was nowhere near either of these cities nor

18  on the route between them.   *Id.* at 30:7–31:19, 61:6–12; *cf. Sigmond-Ballesteros*, 285 F.3d

19  at 1121–23 (finding no reasonable suspicion where driver's actions were completely

20  reasonable).

21  Second, Defendant's actions—circling around the Ameri Mexi for a significant

22  period of time and waiting at the dirt pullout near the United States-Mexico border—was

23  consistent with human smuggling behavior.   To begin, multiple agents spotted Defendant

24  aimlessly lingering around and circling the Ameri Mex gas station and convenience store

25  for more than an hour.   Tr. Hr'g 1 at 8:17–9:16, 10:4–6; Gonzales Mem. at 2; *see Brignoni-*

26  *Ponce*, 422 U.S. at 884–85.   This conduct was suspect because human smugglers frequently

27  wait outside the Ameri Mex for long periods of time while awaiting instructions on where

28  to pick up noncitizens.   Tr. Hr'g 1 at 28:8–19, 35:4–9, 42:14–17; s*ee United States v.*

*Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013) (finding reasonable suspicion where vehicle was located on interstate "commonly used by smugglers"). Furthermore, almost two hours later, agents observed Defendant, still in Tecate, at a dirt pullout next to an abandoned broken bus where he remained for over an hour. Tr. Hr'g 1 at 36:5–37:20, 83:1–3; Tr. Hr'g 2 at 4:21–5:2. This behavior also reasonably raised questions—because human smugglers frequently wait at this pullout to pick up noncitizens and because there was no apparent reason to loiter in this spot for an extended period. Decl. Gonzales ¶ 18; Decl. Humphries ¶ 7; *see United States v. Cortez*, 449 U.S. 411, 419 (1981) (finding probable cause where agents knew a specific vehicle had a pattern of waiting for and picking up individuals crossing the border). Defendant's behaviors are not consistent with those of innocent travelers; in fact, it is hard to imagine another reason why a lost couple from the Los Angeles area would spend an hour circling the Ameri Mex and then another hour stopped in a dirt pullout in the border town of Tecate. *Cf. Sigmond-Ballesteros*, 285 F.3d at 1121 (establishing that a court may not find reasonable suspicion where the factors "depicts a very large category of presumably innocent travelers" (internal citation and quotation marks)).

Finally, Defendant's suspect pattern of behavior coincided with a report of illegal border crossings. *See Brignoni-Ponce*, 422 U.S. at 885. While observing the Jaguar at the dirt pullout, Agent Huggins received a notification that three to four individuals were spotted crossing the border moving north towards Defendant's location. Tr. Hr'g 1 at 84:21–24, 85:2–11. Around thirty minutes after the notification—enough time for the noncitizens to travel from the border to the dirt pullout—Officer Huggins observed Defendant start to drive away from the pullout. *Id.* at 87:25–88:14; Decl. Huggins ¶ 9. Collectively, these facts provide an objective basis to suspect that Defendant had circled the Ameri Mex awaiting instructions on where to pick up undocumented individuals, lingered in a dirt pullout anticipating their illegal border crossing, and then left the pullout after hiding the individuals in his vehicle. Tr. Hr'g 1 at 91:14–92:11; Tr. Hr'g 2 at 4:21–6:19; Decl. Huggins ¶ 13.

Because Defendant's suspicious driving patterns coincided with an illegal border crossing, Agent Huggins had a particularized factual basis to suspect Defendant of human smuggling.

**D. Even if Agent Huggins's *Terry* Stop Became an Arrest, It Was Supported by Probable Cause**

For the sake of thoroughness, assuming the investigatory stop became an arrest when Agent Huggins raised his firearm and Agent Wemhoener handcuffed Defendant and placed him in the back of the vehicle, the Court will examine whether this incident was supported by probable cause.

Under the Fourth Amendment, a warrantless arrest requires probable cause. *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). To establish probable cause, the government must demonstrate that the officers had "knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Id.* Whether probable cause exists depends "on the totality of facts" available to the officers, who "may not disregard facts tending to dissipate probable cause." *Sialoi v. City of San Diego*, 823 F.3d 1223, 1232 (9th Cir. 2016) (internal citations and quotation marks omitted). While "[m]ere suspicion, common rumor, or even strong reason to suspect are not enough" to meet probable cause, it also does not require officers "to believe to an absolute certainty, or by clear and convincing evidence, or even by a preponderance of the available evidence" that a suspect has committed a crime as all that is required is a fair probability. *Lopez*, 482 F.3d at 1072, 1078 (internal citations and quotation marks omitted). Critically, an arresting officer's subjective intent is immaterial as probable cause is an objective standard. *Id.* at 1072.

The Ninth Circuit has established that a stop that evolves into an arrest may be supported by probable cause where a defendant responds hostilely to the stop. In *United States v. Fuentes*, the circuit court concluded that officers established probable cause in conducting a consensual search that ultimately became an arrest where the defendant grew

Crim case: 22-cr-2135-JO-1

evasive and forceful as the officers identified something in his pocket. 105 F.3d 487, 488–90 (9th Cir. 1997). The court found that because the defendant "emphatically" tried to stop the search and pushed an officer to "tr[y] forcibly to get away," there was sufficient evidence to lead a person of reasonable caution to believe that an offense had been or was being committed. *Id.* at 490. The Ninth Circuit reasoned that while "[m]ere refusal to consent to a stop or search does not give rise to reasonable suspicion or probable cause," a defendant's "flight together with other evidence" can establish probable cause. *Id.*

Here, in addition to Defendant's earlier actions that prompted Agent Huggins to initiate a stop, Defendant also defied and attempted to evade Agent Huggins's efforts to pull him over, giving him further reason to believe that Defendant was engaging in criminal conduct. Tr. Hr'g 2 at 12:9–13:5. The suspicious behavior discussed above of (1) lingering close to an hour near the Ameri Mex in the border region of Tecate for no credible reason; (2) waiting an hour at a dirt pullout near an abandoned bus prior to an illegal border crossing; and (3) leaving the dirt pullout thirty minutes after people were spotted crossing the border, provided reason to believe that Defendant was engaged in human smuggling. Moreover, Defendant's actions after Agent Huggins initiated the stop only served to provide further reason to suspect Defendant was engaging in criminal conduct; he engaged in several actions to evade and resist Agent Huggin's *Terry* stop. *See Fuentes*, 105 F.3d at 490. First, Defendant refused to pull over despite Agent Huggins's use of the siren and multiple opportunities to do so. Tr. Hr'g 1 at 95:19–97:1; Tr. Hr'g 2 at 9:9–10:24. After Agent Huggins pulled him over in the Café 94 lot, Defendant drove forward and started making a U-turn, pointing the car at Agent Huggins. Tr. Hr'g 1 at 97:8–11; Tr. Hr'g 2 at 12:15–18. Defendant continued to do so even after he was commanded to stop driving and turn off his vehicle. Tr. Hr'g 1 at 97:12–19; Tr. Hr'g 2 at 12:19–13:1. Like in *Fuentes*, where the suspect attempted to evade investigation and flee, Defendant similarly refused to comply with Agent Huggins's order to stop the car and indicated that he intended to leave or possibly even hurt Agent Huggins. 105 F.3d at 490; Tr. Hr'g 1 at 97:20–23; Tr. Hr'g 2 at 12:24–13:5, 14:6–15:9. Because Defendant defiantly responded to law

enforcement, attempted to flee the stop, and even aimed his car as if to hit Agent Huggins, a reasonable person would believe that Defendant had something of an "incriminating character" to hide and that he feared that he would be caught if he complied with the officer's orders. *See Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *cf. United States v. Collins*, 427 F.3d 688, 691 (9th Cir. 2005) (finding no probable cause where officers assumed criminal behavior only because of the defendant's "mere propinquity to others independently suspected of criminal activity" (internal citations and quotation marks omitted)). Thus, these factors coupled with the earlier evidence established probable cause to conduct an arrest.

Accordingly, the Court concludes that even if Agent Huggins's *Terry* stop evolved into an arrest, there was probable cause as these facts would clearly "lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Lopez*, 482 F.3d at 1072.

### III. CONCLUSION AND ORDER

For the reasons set out above, the Court DENIES Defendant Moten's motion to suppress [Dkt. 67].

IT IS SO ORDERED.

Dated: March 27, 2024

_____
Honorable Jinsook Ohta
United States District Judge